IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

YOUNGER-HOLMES ELECTRICAL )
CONTRACTORS, INC., an )
Oklahoma corporation, )
                                     )
            Plaintiff, )
                                     )
v. ) No. CIV-08-956-L
                                     )
BE&K BUILDING GROUP, LLC, a )
Delaware limited liability company, )
                                     )
            Defendant. )

## **MEMORANDUM OPINION**

On September 11, 2008, plaintiff filed this action seeking damages for breach of contract.[1] Defendant BE&K Building Group, LLC ("BE&K") counterclaimed for breach of contract, breach of implied warranties, and for indemnification. This matter was tried to the court without a jury on May 17-18, 2010. In accordance with Fed. R. Civ. P. 52(a), this memorandum opinion constitutes the court's findings of fact and conclusions of law.

The evidence presented at trial establishes that on September 12, 2007, plaintiff entered into a contract with BE&K, who was the general contractor for an addition to the emergency department at the Ponca City Medical Center. Plaintiff's

---

[1] The action was originally brought against three defendants: BE&K, Inc.; Community Health Systems, Inc.; and BE&K Building Group, LLC. On November 20, 2008, plaintiff filed a Notice of Voluntary Dismissal Without Prejudice of its claims against BE&K, Inc. On February 12, 2010, plaintiff filed a stipulation dismissing its claims against Community Health Systems, Inc. with prejudice.

Exhibit 1. Pursuant to the contract, plaintiff agreed to provide electrical and fire alarm work in return for payment of $456,313.00. Id. at YH-1247. The contract provided that changes to the contract could be made "only by issuance of a written Subcontract Change Order" and that "[n]o increase or decrease in Subcontract Price or extension of time shall be binding on Contractor unless agreed in a Subcontract Change Order signed by Contractor's Project Manager or Subcontract Administrator." Id. at ¶¶ 6(a) and 6(b).

As of March 2008, BE&K was behind on the project by three weeks. The parties agree that the delay was not caused in any way by plaintiff. Nonetheless, in an attempt to get the project back on track, BE&K requested that plaintiff submit a proposed request for additional regular and overtime hours. Plaintiff submitted the written request to BE&K on March 11, 2008. Plaintiff's Exhibit 2 at YH-2370. BE&K, however, did not issue a proposed change order until April 28, 2008. Id. at YH-2367. Rod Wohl, plaintiff's president, executed and returned the change order that same date. Id. BE&K's project manager, however, did not sign the change order until June 2, 2008.[2] Id. Absent a change order executed by BE&K's project manager, plaintiff had no contractual right to payment for the additional hours and overtime work requested. Based on this change order and five other change orders, the amount due plaintiff under the contract was adjusted to $533,061.00.

---

[2]The change order reflects that it was received by BE&K on May 29, 2008. There was no explanation for the one-month delay in receipt.

Three weeks before the proposed change order was issued by BE&K, its project manager, David Carr, sent plaintiff an e-mail authorizing it "to proceed with overtime work to accelerate the schedule 3 weeks per your proposal dated 3/11/08 in the amount of $18,554. Schedule durations to be revised as per Marland's updated schedule. A formal change order to your subcontract is forthcoming." Defendant's Exhibit 4.[3] The revised schedule issued by BE&K required plaintiff to complete overhead rough-in by May 30, 2008 and to have all overhead wiring completed by June 5, 2008. *See* Defendant's Exhibit 5. Although the schedule does not reflect this, the parties agree that the Air Handling Unit ("AHU") was to be placed on permanent power by May 27, 2008. The AHU's being operational was particularly important so that humidity and temperature could be controlled in the interior space, which would facilitate curing for drywalling, painting, and flooring. Completion of the overhead electrical work by June 5 was critical because that was the beginning date for installation of the ceiling grid. Thus, timely completion of electrical work was necessary for timely completion of the entire project as other trades could not finish their work until these items were completed.

In early May 2008, BE&K began having concerns that plaintiff was behind on the revised schedule. On May 9, 2008, Carr sent Wohl an e-mail questioning

---

[3]The court rejects defendant's assertion that this e-mail constitutes a Field Directive within the meaning of the contract. In accordance with the contract, a Field Directive only applies "[i]f Contractor and Subcontractor cannot agree on the cost or additional time required due to a Contractor directed Change". Plaintiff's Exhibit 1 at ¶ 6(c). In this instance, there was no disagreement as to the cost or additional time required. Furthermore, the fact that Carr indicated a formal change order would be coming demonstrates BE&K was not issuing a Field Directive.

whether plaintiff had sufficient manpower on the jobsite to complete overhead wiring by June 5. Defendant's Exhibit 6. Carr asked Wohl to contact him to "let me know what your plan is to meet the schedule dates". Id. On May 19, 2008, Carr and Wohl agreed that plaintiff would meet the schedule completion dates, including completion of overhead work by June 5 and providing permanent power to the AHU by May 27. *See* Plaintiff's Exhibit 7. Two days later, Carr again contacted Wohl via e-mail to express his concerns over what he perceived to be a manpower shortage by plaintiff. He noted:

> We are getting more concerned about Younger's schedule performance. It appears that Younger still does not have enough manpower on site to meet the schedule. I believe there were only 6 men on site today. Again the upcoming critical dates are 5/27/08 to turn on AHU and 6/5/08 to have all above ceiling work completed prior to grid installation. Please give me a call to discuss [your] plan to meet the schedule.

Defendant's Exhibit 7. Carr followed up the next day with a list of items that needed to be accomplished in order to complete the overhead work on time. Defendant's Exhibit 8. Carr concluded his missive by stating that

> this is a huge amount of work to get completed in two weeks and with the manpower that is currently on site we do not see any way Younger can meet the schedule dates. Younger needs to provide adequate qualified manpower on site starting tomorrow to meet these dates. Younger needs to work this weekend as well. If the above ceiling work is not completed per the schedule Younger will have to work thru the ceiling grid and be responsible for all costs associated with any damage.

4

>Rod there must be noticeable improvement by Tuesday morning 5/26/08 or BE&K will need to take corrective measures. Please call me to discuss [your] plan to meet the schedule dates.

Id.

The next day was the Friday before Memorial Day. On that day, Carr had a Notice of Default hand-delivered and e-mailed to Wohl. The letter advised plaintiff that

> by e-mail dated 5/9/08 BE&K notified Younger Holmes Electric (Younger) of our concern that Younger was falling behind schedule due to its lack of sufficient qualified manpower. Younger failed to provide adequate additional manpower to progress to meet the schedule.
>
> On 5/21/08 BE&K again notified Younger by e-mail that Younger was continuing to fall seriously behind schedule, and that Younger must increase its manpower. As we discussed yesterday, Thursday 5/22, Younger would attempt to increase its manpower. To BE&K's disappointment, Younger has still not done so. There are only 7 electricians on site today.
>
> * * *
>
> The purpose of this letter is to notify Younger that it is in default of its subcontract referenced above for failure to provide sufficient qualified manpower and for project delay. In accordance with the terms of said subcontract, Younger is hereby directed to provide, within three (3) days of receipt of this Notice, a manpower level of no less than 15 qualified electricians so as to overcome its delayed performance and to continue with diligence and promptness completion of its work. Further, Younger is to treat with priority those work items and completion dates identified in BE&K's e-mail of 5/22/07 [sic].

5

> Should Younger fail to proceed as directed herein, without further notice to Younger, BE&K shall supplement your work force, including subcontract to others or otherwise, and all costs in so doing, including without limitation costs incurred by other trades due to delay, shall be borne by Younger.

Defendant's Exhibit 9 (emphasis in original).

Plaintiff supplied seven electricians on Saturday, May 24, two on May 25, and four on Memorial Day, May 26, 2008. While plaintiff had eleven electricians at the job site on Tuesday, May 27, 2008, it was unable to provide permanent power to the AHU on that day as specified in the May 22, 2008 e-mail. When plaintiff did not have fifteen electricians on the job site on May 28, 2008, Carr sent a letter notifying plaintiff that it was exercising its right under the contract to supplement plaintiff's workforce. Defendant's Exhibit 10. The parties' contract provides that:

> Should Subcontractor at any time: (1) fail to supply the labor, materials, equipment, supervision and other things required of it in sufficient quantities and of required quality to perform the Work with the skill, conformity, promptness and diligence required hereunder . . . Contractor shall, after giving Subcontractor notice of default and forty-eight (48) hours within which to cure, have the right to exercise any one or more of the following remedies:
>
> * * *
>
> attempt to remedy the default by whatever means Contractor may deem necessary or appropriate, including, but not limited to, correcting, furnishing, performing, or otherwise completing the Work, or any part thereof, by itself or through others (utilizing, where appropriate, any materials and equipment previously purchased for that purpose by Subcontractor) and deducting the cost thereof

6

> (plus an allowance for administrative burden equal to fifteen percent (15%) of such costs) from any monies due or to become due to Subcontractor hereunder.

Plaintiff's Exhibit 1 at ¶ 7(a).

On May 28, 2008,[4] Tommy Downs, a representative of Downs Electrical Constructors ("Downs"), conducted a walk-through of the project to determine the amount of electrical work that had been completed and what remained to be done. Downs, an electrical contractor based out of Nashville, Tennessee, specializes in hospital projects and had worked with BE&K on previous projects. After performing the walk-through, Tommy Downs reported that the electrical work was ten to twelve weeks behind schedule in his opinion. He estimated that an additional twenty skilled electricians would be needed to complete the electrical work on time. That same day, BE&K hired Downs to supplement plaintiff's workforce. BE&K, however, did not execute a contract with Downs, nor did it place any restrictions on what expenses could be charged back to plaintiff or place any cap on the amount Downs could spend. Downs, in turn, contracted with a temporary agency to provide electricians for the project. Approximately 70 percent of the supplemental electricians lived in Oklahoma, though there was no evidence of exactly where in the state they lived. The remaining 30 percent of electricians were from surrounding states, including

---

[4] BE&K had actually contacted Downs the week prior to the walk-through, and Tommy Downs was on the work site on May 27, 2008, the day before BE&K notified plaintiff that it would be supplementing the workforce.

7

Kansas, Arkansas, and Texas. Plaintiff continued to work side-by-side with Downs and the supplemental electricians, and the project was completed on time.

The parties agree that plaintiff was owed $533,061.00 on the project and that BE&K has paid $193,827.00, for a balance owing of $339,234.00. BE&K claims it is entitled to deduct $339,106.00 from this amount, of which $271,604.00 is attributable to charges made by Downs and $44,231.00 constitutes a 15 percent fee charged by BE&K.[5]

Plaintiff contends BE&K breached the parties' contract because it failed to act reasonably and in good faith in declaring default and in back-charging plaintiff. BE&K counters that plaintiff breached the parties' contract by failing to supply sufficient manpower to complete the project in a timely manner and to meet the required benchmarks.[6] "Every contract in Oklahoma contains an implied duty of good faith and fair dealing." Gens v. Casady School, 177 P.3d 565, 570 (Okla. 2008).

---

[5]Plaintiff does not dispute charges for the fuel and generator used to power the AHU, nor does it challenge the minor drywall and painting charges. Under the contract, BE&K was permitted to withhold payment for these amounts. See Plaintiff's Exhibit 1 at ¶ 2(g). This paragraph, however, does not permit BE&K to charge a 15 percent "administrative burden" fee on top of the charges; rather, these charges should have been a straight pass-through. Compare Plaintiff's Exhibit 1 at ¶ 2(b) with id. at ¶ 7(a)(ii).

[6]BE&K's second and third counterclaims asserted claims for breach of implied warranty of workmanlike construction and breach of the implied warranty of fitness for intended purposes. The court questions whether implied warranty claims can be asserted in this context. Nonetheless, as BE&K presented no evidence or argument with respect to these claims, the court finds it abandoned those claims. Plaintiff is therefore entitled to judgment in its favor on BE&K's second and third counterclaims.

> "Good faith is generally regarded as requiring the exercise of reasonable diligence to learn the truth, and . . . [h]e who claims . . . that he has been misled through the conduct of another must not have been misled through his own want of reasonable care." While "[g]ood faith is the opposite or antithesis of bad faith," it does not follow that good faith is merely the lack of bad faith. One may act in a manner that does not demonstrate bad faith yet that conduct may fall short of the reasonable diligence required of "good faith."
>
> "The question of good faith depends upon the mental attitude of the person whose motives are in question and in common with other questions of that character usually presents a question of fact." It is to be "determined from the facts and circumstances surrounding the transaction, as well as (or independent of) the declarations of the party."

Smalygo v. Green, 184 P.3d 554, 559 (Okla. 2008) (citations omitted). To prove its breach of contract claim, BE&K must establish three elements: (1) formation of a contract; (2) breach of that contract; and (3) actual damages suffered from that breach. Digital Design Group, Inc. v. Information Builders, Inc., 24 P.3d 834, 843 (Okla. 2001). There is no dispute regarding the first element, but analysis of the other two elements is intertwined with plaintiff's claim that BE&K failed to act reasonably and in good faith.

The court finds that BE&K was within its rights under the contract to issue the letter of default on May 23, 2008. Contrary to plaintiff's assertion, BE&K had consistently advised plaintiff that it was concerned about the lack of manpower on the site and the effect that would have on timely completion of the project. *See* Defendant's Exhibit 6, Defendant's Exhibit 7, Defendant's Exhibit 8. The contract

9

specifically provided that failure to provide sufficient labor to perform the work in a timely manner constituted default. Plaintiff's Exhibit 1 at ¶ 7(a). Under the contract, BE&K was obligated to give plaintiff notice of any deficiency and forty-eight hours within which to cure. Id. The May 23, 2008 letter constituted this notice. The letter informed of BE&K's belief that sufficient qualified manpower had not been provided by plaintiff and notified plaintiff of precisely what was needed to cure this default: "a manpower of no less than 15 qualified electricians". Defendant's Exhibit 9 (emphasis in original). Even though the contract only required forty-eight hours notice, BE&K gave plaintiff three days from receipt of the letter to cure its default.[7] Moreover, BE&K actually waited an additional day before declaring its intention to supplement plaintiff's workforce.[8]

That being said, the court also finds BE&K is not entitled to offset the amount it seeks. As the parties' contract does not permit BE&K to add a 15 percent administrative fee to the charges for the generator, its fuel, and drywall repairs, *see supra* n.5, the amount sought must be reduced by $3,604.35. In addition, the court finds that BE&K failed to act reasonably and in good faith with respect to the charge-backs for Downs' work on the project. First, BE&K made no effort to minimize costs

---

[7]Plaintiff contends that providing notice late in the day on the Friday before Memorial Day was objectively unreasonable. The court disagrees, particularly given that BE&K gave plaintiff more time than required under the contract within which to effect a cure.

[8]The court does not find it unreasonable that BE&K contacted Downs prior to sending the letter of default. Rather, it appears to have been a prudent business decision to investigate whether Downs would be able to assist BE&K with the project should plaintiff fail to provide sufficient manpower in time.

10

by entering into a contract with Downs or by exercising business judgment to delete charges that were not appropriate. The fact that the contract between plaintiff and BE&K gave BE&K the right to charge an additional 15 percent on top of Downs' charges worked as a disincentive to scrutinize Downs' bills. The court, however, operates under no such conflict of interest. Having examined Downs' billings, the court finds a number of items must be disallowed. First, there was no explanation for the charge labeled "fee"on Downs' summary; the court therefore disallows this $30,266.90 charge. *See* Plaintiff's Exhibit 39 at YH-2127. Second, the court finds that Downs charged BE&K, and therefore plaintiff, for personal items[9] and for equipment[10] that was not expendable on the job. The record does not reflect what was done with this equipment after Downs left the job site. For all the court knows, Downs or BE&K retained the equipment; charging plaintiff is therefore not reasonable. Third, Downs' summary sheet reflects a total of $186,075.89 for direct labor costs, which represents the cost of the supplemental electricians. Id. at YH-2127. The underlying invoices, however, add up to $168,026.95, a difference of $18,048.94. *Compare* Plaintiff's Exhibit 39 at YH-2127 *with* id. at YH-2160-73.

---

[9]For example, there were charges for phone chargers, reading glasses, fragrance, cameras, and a laundry basket. *See* Plaintiff's Exhibit 39 at YH-2136, YH-2181, YH-2183, YH-2185, YH-2194, YH-2236, and YH-2265.

[10]For example, there were charges for portable scaffolding, tool boxes, rotary drills, and ladders. *See* Plaintiff's Exhibit 39 at YH-2140, YH-2200, YH-2204, YH-2279, YH-2281, YH-2283, and YH-2291.

11

Finally, the court finds that numerous charges were simply unreasonable,[11] such as charging per diem for supervisory employees while also charging for room and board, which is normally covered by the per diem. The court thus disallows this duplication of charges by deleting the supervisory employees' per diem charges. In addition, the court finds it unreasonable to charge plaintiff for first-class airfares. As there was no evidence what a reasonable fare would have been, the court disallows all charges for first-class fares. The court also finds plaintiff should not be made to pay for charges unrelated to this project, such as transportation and meal costs for a supervisor's family.[12] Finally, there was no evidence that it was reasonable to pay per diem to the 70 percent of supplemental electricians who lived in Oklahoma.[13] BE&K presented no evidence that any of the Oklahoma electricians lived at such a distance from the project site that payment of per diem was reasonable. As BE&K is seeking these amounts through its counterclaim, it bears the burden of substantiating them. *See* Colton v. Huntleigh USA Corp., 121 P.3d 1070, 1073 (Okla. 2005).

In sum, the court disallows $82,226.88 of the $277,214.00 originally charged by Downs. Subtracting this amount and the undisputed amounts allowed plaintiff by

---

[11]BE&K is only entitled to repayment of reasonable costs to complete the project. *See* Hardeman v. United States Fidelity & Guaranty Co., 486 P.2d 726, 731 (Okla. 1971).

[12]*See, e.g.,* Plaintiff's Exhibit 39 at YH-2248, YH-2250-55; YH-2259.

[13]The per diem charges for the supplemental electricians totaled $17,440.00. The court disallows 70 percent of this amount, which is $12,208.00.

BE&K[14] results in a total allowed cost for completion of the electrical work of $188,627.12. Fifteen percent of $188,627.12 is $28,294.07. Adding these two sums together results in allowed total back-charges for Downs' work of $216,921.19. As there is no dispute that BE&K is allowed to retain the $24,029.33[15] associated with the generator, fuel, drywall and painting charges, the court finds the total amount BE&K may withhold under the contract is $240,950.52. As the balance owed to plaintiff on the contract including retainage is $339,234.00, BE&K is directed to pay plaintiff $98,283.48. Judgment shall issue accordingly.

It is so ordered this 3rd day of December, 2010.

_____
TIM LEONARD
United States District Judge

---

[14]BE&K credited plaintiff for $6,360.00, which it subtracted from Downs' costs. Defendant's Exhibit 21 at 200.

[15]The court notes that the summary of charges shown on Defendant's Exhibit 21 at 200 reflects a typographical error. The invoice for the Air Balancing cost, id. at 5, shows a total charge of $1,088.33, while Defendant's Exhibit 21 at 200 reflects the cost as $1,080.00. The court has used the amount shown on the invoice to calculate the amount owed.